In re Brad L. FRY and Elizabeth A. Fry, his wife, Debtors.

Stephen A. GERST, David A. Groseclose and Michael J. Cohen, Plaintiffs,

v.

Brad L. FRY and Elizabeth A. Fry, his wife, Defendants.

Bankruptcy No. B–80–2761–PHX–RGM.

Adv. No. 81–154–RGM.

United States Bankruptcy Court, D. Arizona.

Oct. 6, 1981.

David A. Groseclose, Phoenix, Ariz., for plaintiffs.

Gordon B. Giles, Scottsdale, Ariz., for defendants/debtors.

OPINION AND ORDER ON COMPLAINT TO DETERMINE NONDISCHARGE-ABILITY OF A DEBT

ROBERT G. MOOREMAN, Bankruptcy Judge.

This adversary complaint, filed March 10, 1981, arises from the debtors' voluntary petition filed under 11 U.S.C. Chapter 7, on December 10, 1980. Plaintiffs by their pleadings seek a determination of nondischargeability of a debt pursuant to certain provisions of 11 U.S.C. § 523(a)(2)(A), and (a)(4) and (a)(6), the applicable provisions of which are set forth hereinafter.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

.    .    .    .    .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

.    .    .    .    .

(6) *for willful and malicious injury by the debtor to another entity or to the property of another entity*; .... (Emphasis supplied)

A trial was held on August 31, 1981, and the matter was submitted to the court on the evidence and subsequent legal memoranda by the parties from which the court finds and concludes as follows:

The debtors dba Arts Management Associates, an unincorporated association, were engaged in the business of promoting concerts and shows featuring various well known performers and celebrities such as George Burns, Helen Reddy, Red Skelton and the popular Country Western singer, Loretta Lynn.

After some preliminary negotiations, the debtor, Brad L. Fry, entered into a *first contract* on April 16, 1980 with the plaintiffs, under which he agreed to procure the performance of Loretta Lynn on September 10, 1980, at Grady Gammage Auditorium for which the plaintiffs paid the sum of $15,000. Under the contract, the plaintiffs were to receive 50% of the net profits derived from the performance and the debtors the remaining 50% of said venture. (A copy of the contract (Ex. 1) is appended and made a part of this opinion.)

Approximately two weeks later, on April 30, 1980, the debtor entered into a *second contract* with the American Diabetes Association Arizona Chapter (ADA) in which it was promised the promotion of the same concert featuring the same performer, Loretta Lynn, at the same time, September 10, 1980 (a copy of which is also appended as Exhibit 2). Under this *second contract*, the debtor received a $7,500 cash promotional fee and a $2,500 retainer from the ADA who received the profits from the performance which ultimately took place at Rawhide, Arizona on the scheduled performance date.

On April 18, 1980, between the two contracts in question, the debtor negotiated an agreement with United Talent, Inc., agents of Loretta Lynn, to secure the September 10, 1980 performance. Under this agreement, the debtor promised to pay $25,000 for Loretta Lynn to perform with the sum of $12,500 to be paid at that time and the balance to be paid on the day of the performance. Facts presented at trial indicate that the debtor utilized the $15,000 procured from the plaintiffs towards the $12,500 payment to United Talent.

Subsequent to the above described contracts, the plaintiffs learned of the ADA performance by hearing a radio announcement advertising the Rawhide concert, and on August 7, 1980, the debtor sent notification to plaintiffs by mailgram of his desire to discontinue the venture, and offering to return the $15,000 investment plus interest. However, this was not accomplished. On August 13, 1980, the debtor, Brad L. Fry, met personally with the plaintiff, Stephen Gerst, and as a result of this meeting, an affidavit was prepared and signed by the debtor in which he stated that he contracted with the ADA without the knowledge or consent of the plaintiffs and that he used the funds provided by them to secure the performance of Loretta Lynn. In addition, the debtor stated that he would provide security for the obligation which security later proved to be upon the debtors' homestead and heavily encumbered and subject to forfeiture.

At no time prior to the double contracts time frame were the plaintiffs told by the debtor of his dealings with the ADA or his use of the $15,000 for procuring the performance contemplated under the first contract with the plaintiffs. In the complaint, two separate grounds were asserted as a basis for nondischargeability and later a

third ground based on section 523(a)(6) was argued to the court upon the memoranda submitted and in conformance with the evidence of the trial. First, the plaintiffs have argued that the money was obtained by false pretenses, or actual fraud. This allegation was presumably based on 11 U.S.C. § 523(a)(2)(A). Second, the plaintiffs alternatively argue that the debtors committed fraud, or defalcation while acting in a fiduciary capacity, or alternatively, embezzlement or larceny. This allegation was presumably based on section 523(a)(4). The court finds that these first two grounds are inapplicable to this case and not supported by the evidence presented, and therefore, take up the third ground—that is, section 523(a)(6), supra.

The plaintiffs argue, based on the evidence, that the debtors' acts constituted a "willful and malicious injury to property." This allegation presumably follows from section 523(a)(6) of the Bankruptcy Code which prohibits a discharge for willful and malicious injury by the debtor to another entity or to the property of another entity. This section replaces section 17(a)(8) of the former Bankruptcy Act which also excepted from discharge debts of that nature. While willful and malicious conversion is not expressly specified under section 523(a)(6), it has been held that "willful and malicious injury" encompasses "willful and malicious conversion." See 3 *Collier on Bankruptcy*, ¶ 523.16 (15th Ed. 1979), *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), *In Re Meyer*, 7 B.R. 932 (Bkrtcy.N.D.Ill.1981).

Therefore, the issue before the court is whether the specified acts of the debtors constitute a willful and malicious injury or conversion to the plaintiffs or to the property and are clearly proven by the evidence of the plaintiffs. This question must be answered in the affirmative upon the facts and law presented at the trial.

This conclusion is reached by an analysis of the following case law which presents factual patterns analogous to the instant case.

In the case of *In Re Prenzi*, 3 B.R. 165 (Bkrtcy.D.Ariz.1980) (Judge William A. Scanland), the debtors failed to comply with the terms of a written agreement which required them to execute a $3,000 promissory note and post it as a bond in the Superior Court as part of a settlement in a pending lis pendens action. The debtor failed to do this and later sought to have the debt discharged in bankruptcy. The bankruptcy court held the debt to be non-dischargeable finding that the debtors' failure to execute the note was a willful and intentional act. While this case was decided under the former Bankruptcy Act § 17(a)(8), the same principles apply under the new Bankruptcy Code. In the instant case, the debtors herein as in *Prenzi*, knowingly failed to abide by an express agreement with the plaintiffs and in direct contravention of the agreement used funds obtained from the plaintiffs for the purpose of securing the performance of Loretta Lynn on behalf of the ADA. By this action the debtor caused direct injury to the plaintiffs by depriving them of their investment and selling the same performance to another party and after the plaintiffs' funds had been used in procuring the artist's performance for the benefit of another.

Also pertinent on the issue of dischargeability is the case of *In Re McCloud*, 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980). There the debtor, in direct violation of a written security agreement made with a bank, sold certain livestock that was pledged as security. The court found that this act constituted a willful and malicious conversion under section 523(a)(6). This decision was based on the fact that such a sale of collateral was unauthorized, that the bank had rights in the collateral, and that the bank was unaware of any likelihood that the collateral would be sold. These same factors are present in the instant case. No authorization was given to the debtors to seek an alternative and competing sponsor for the September 10, concert. Pursuant to the original contract between the parties, the plaintiffs had a vested interest in the performance. Finally, no evidence was presented indicating that the plaintiffs

were timely notified by the debtor, Brad L. Fry, of his prior and subsequent negotiations and ultimate contract with the ADA. In fact, the first notice the plaintiffs received of the debtors' dealings was by hearing a radio announcement advertising the September 10th concert on behalf of the ADA which was heard by the plaintiff Gerst on his car radio.

In summary, the court finds and concludes that the debtors' acts fall within the definition of "willful and malicious injury" as applied in section 523(a)(6). As the court in the *McCloud* decision stated,

If an act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice. See *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916); *Bennett v. W. T. Grant Co.*, 481 F.2d 664 (4th Cir. 1973).

Therefore, while the debtors may have entered into the agreement with the plaintiffs in good faith, the subsequent intentional conduct under the circumstances acted to deprive the plaintiffs of all property rights and profits connected to the September 10, 1980 performance of Loretta Lynn. This being the case, the court holds that the resultant debt is nondischargeable as to the debtors herein.

Pursuant to F.R.C.P. 52, this opinion and order shall constitute Findings of Fact and Conclusions of Law herein.

## APPENDIX

## EXHIBIT 1

### AGREEMENT OF ASSOCIATION

The parties to this AGREEMENT are ARTS MANAGEMENT ASSOCIATES, INC., and STEPHEN A. GERST, MICHAEL J. COHEN and DAVID A. GROSECLOSE.

WHEREAS, Arts Management Associates, Inc., desires to accept an investor, and Stephen A. Gerst, Michael J. Cohen and David A. Groseclose desire to invest in an upcoming production promoted by Arts Management Associates, Inc., per proposal for the Loretta Lynn Show attached hereto and made a part of this Agreement;

THEREFORE, the parties have entered into the following Agreement:

1. In consideration of the promises contained herein, investors agree to invest the sum of $15,000.00 with Arts Management Associates, Inc.

2. In consideration for this investment capital, Arts Management Associates, Inc., agrees to pay to Stephen A. Gerst, Michael J. Cohen and David A. Groseclose fifty percent (50%) of the NET PROFITS from the Loretta Lynn concerts to be held on September 10, 1980, or return $15,000.00 with interest at eighteen percent (18%) per annum from the date of this Agreement, whichever is greater.

(a) If the above concert is postponed for any reason, the parties agree that this Agreement may be cancelled at the option of the investors and the $15,000.00 together with interest at eighteen percent (18%) per annum, shall be refunded to them within thirty (30) days.

(b) The term NET PROFITS as used herein shall mean the sums remaining from Gross Income after payment of the expenses set forth in the attachment hereto and after reimbursement hereto investors of their initial $15,000.00 investment.

(c) Repayment to occur within thirty (30) days of settlement of concert proceeds with the Box Office. Investors are to receive a full accounting of all ticket sales, receipts and expenditures.

IN WITNESS OF THIS AGREEMENT, the parties have signed it below this 16 day of April, 1980.

ARTS MANAGEMENT ASSOCIATES, INC.

| | |
|---|---|
| Michael J. Cohen<br>Michael J. Cohen, Investor | By Brad L. Fry<br>BRAD L. FRY, President |
| Stephen A. Gerst<br>Stephen A. Gerst, Investor | By Brad L. Fry<br>BRAD L. FRY, Guarantor |
| David A. Groseclose<br>David A. Groseclose, Investor | By Elizabeth Fry<br>ELIZABETH FRY, Guarantor |

Received From Stephen A. Gerst the sum of $15,000 on 4–16–80

Beverly F. Jewell (AMA, Inc.)

EXHIBIT 2

**ARTS MANAGEMENT ASSOCIATES, INC.**
4232 N. Brown Ave. • Suite L • Scottsdale, Arizona 85251.

## C O N T R A C T

AGREEMENT made this 30th day of April , 1980 , between ARTS MANAGEMENT ASSOCIATES, INC. (hereinafter referred to as PRODUCER), and American Diabetes Association, Arizona Affiliate (hereinafter referred to as PURCHASER.)

It is mutually agreed between the Parties as follows:

The PRODUCER agrees to furnish and the PURCHASER does hereby purchase for the engagement hereinafter provided a complete musical organization of approximately nine people, including leader, under the direction of __Loretta Lynn__ upon all of the terms and provisions set forth herein and/or on the attachment(s) which are hereby made a part of this agreement and are approved by the parties hereto.

SPECIFIC TERMS AND CONDITIONS ARE AS FOLLOWS:

PROMOTIONAL BILLING: __Loretta Lynn and The Coal Miners__
PLACE OF EMPLOYMENT: __Grady Gammage Auditorium__
DATE(S) OF EMPLOYMENT: Wednesday, September 10, 1980
DAYS PER WEEK: __1__ DAY OFF: __None__ NO. OF SHOWS PER NIGHT __Two__
HOURS OF EMPLOYMENT: __7:00 p.m. and 9:45 p.m.__
PRICE AGREED UPON: __$25,000__
SPECIAL CONDITIONS: __N/A__

SCALE OF ADMISSION: __T.B.A.__

Payment of $12,500 to be made upon signing of this agreement. Payment of the balance due $12,500 pursuant to the provisions hereof shall be paid no later than Tuesday, 9/9/1980 by cash, money order, certified or cashier's check to PRODUCER'S representative.

Wherefore the parties hereto have hereunto set their hands and seals the day and year first above written.

PRODUCER: ARTS MANAGEMENT ASSOCIATES INC.

by: _Brad Fry_
Brad Fry, President

IT IS MUTUALLY UNDERSTOOD THAT in the event of a postponement or cancellation by __Loretta Lynn__ for the scheduled Wed. September 10, 1980 performance, ARTS MANAGEMENT ASSOCIATES, Inc. will have thirty (30) days in which to provide a mutually agreeable alternative artist(s).

PURCHASER: AMERICAN DIABETES ASSOCIATION ARIZONA AFFILIATE
by: _George Stoeberl_
George Stoeberl
Address: __555 W. Catalina - Suite 16__
__Phoenix, Arizona 85013__

## MANAGEMENT AND PROMOTION CONTRACT

1. <u>PARTIES</u>: Arts Management Associates, Inc., hereinafter referred to as the Promoter, and <u>American Diabetes Association, Arizona Affiliate</u>, hereinafter referred to as the Organization.

2. <u>PRODUCTION</u>:  Fund raising concert.

3. <u>LOCATION OF PRODUCTION</u>: Grady Gammage Auditorium

4. <u>PRODUCTION DATE</u>:      Wednesday, September 10, 1980

5. <u>GUEST ARTIST(S)</u>:      Loretta Lynn and The Coalminers

6. <u>DURATION OF CONTRACT</u>:  From date of execution to 10 calendar days immediately following the closing of the scheduled production, or for such extended periods of time as called for by the terms of this contract.

7. <u>PROMOTION FEE</u>: · $7,500                    A $2,500 non-refundable retainer to be paid*xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx with balance to be determined and paid to the Promoter within 10 calendar days of the closing of the production.  *on or before July 31, 1980

8. <u>DUTIES OF THE PROMOTER</u>:  The Promoter agrees:

    (a)  To negotiate, in the name and on behalf of the Organization, all contracts with prospective guest artists;

    (b)  To negotiate for and secure performance space and the necessary technical personnel for the production, on behalf of the Organization;

    (c)  To oversee all box office operations and accounting;

    (d)  To arrange all transportation and accommodations for participating guest artists;

    (e)  To oversee all promotional aspects of the production including, but not limited to, news releases, advertising, poster design and printing, ticket printing and public relations.

9. <u>DUTIES OF THE ORGANIZATION</u>:  The Organization agrees:

    (a)  To execute all contracts necessary to obtain the agreed guest artists, performance space, technical personnel and all other requirements of the production in its own name, or, in the alternative, to allow the Promoter to execute all or some of these contracts as agent for the Organization;

    (b)  To bear all overhead expenses and costs of the production and its promotion and to hold the Promoter harmless from any liability thereon;

    (c)  To allow the Promoter to include in all advertising and promotion for the production the designation of producer in the following or an equivalent form: "An Arts Management Associates, Inc., presentation";

    (d)  To provide the Promoter with at least ten complimentary admission tickets to the production;

    (e)  To hold the Promoter harmless from all financial obligations of any kind with respect to both the costs and expenses of the production and its artistic or financial success.

10. ADDITIONAL TERMS:

(a) The Promoter agrees that the Organization will not be liable to the Promoter beyond its initial deposit if, through no fault of the Organization, the production does not take place as scheduled;

(b) If, absent any fault of the parties and for reasons which are unforeseen and beyond the control of parties, the guest artist, or other person essential to the production, is unable or unwilling to proceed with the production as agreed, the Promoter agrees to remain obligated for a maximum period of 12 months to work with the Organization to find a suitable replacement for that artist or other person;

(c) If, during the 12 month period referred to immediately above, the Organization fails to work with the Promoter towards a suitable replacement production or unreasonably withholds approval of a suitable replacement guest artist or artists procured by the Promoter, the Organization agrees that the Promoter is relieved of any and all further obligations under this contract.

IN WITNESS OF THIS CONTRACT, the parties have signed this document this __30th__ day of __April__, 19__80__ .

PROMOTER:  ARTS MANAGEMENT ASSOCIATES, INC.

BY: _____
        Brad L. Fry, President

ORGANIZATION: AMERICAN DIABETES ASSOCIATION
                        ARIZONA AFFILIATE

BY: _____
        George Stoeberl

Address:  555 W. Catalina - Suite 16

            Phoenix, Arizona 85013